Patout vs. Lewis.

No. 12,999.

Mrs. M. A. Patout & Son vs. John B. Lewis.

### SYLLABUS.

(1.) It is not necessary in an act creating a servitude that the accessory rights required to carry it into effect, and without which it would be of no value or service, nor the obligations resulting from these rights should be mentioned. They accompany and pass with the contract as incidents thereof.

(2.) A person consenting to a servitude upon his land thereby consents to a right of access to and from, and a right of passage to and from the land subjected to the servitude in order to give effect to the servitude to the extent, and in the manner known to and contemplated by the parties. He to whom a conventional servitude is due has the right to make all the works necessary to use and preserve the same. He has the right to place a gate in the boundary fence, if one be necessary to reach the grounds, and insist that it be not removed and access to the lands barred.

(3.) It is the duty of the owner of the estate which owes the servitude to fix the place where he wishes it to be exercised when the manner in which the servitude is to be used is uncertain, and the place which is proper for the exercise of the right is not precisely fixed in the title.

(4.) When the right of building and operating a tramway and switch has been granted, and the owner of the land has consented to the use of the land at the end of the switch for the purpose of dumping cane to be thence loaded on cars, and the tramway and switch have been constructed and a dumping ground has been used at a certain place and in a certain manner for several years to the knowledge of all parties—the owner of the land cannot ignore the fixed condition of affairs in which he has acquiesced, and to which he has by his conduct consented, and take down and remove the gate giving access to the grounds, and bar entrance to the latter under a claim that the switch and dumping ground were improperly located and rights to the servitude had been forfeited for non-performance of conditions attached thereto.

(5.) The owner of the land has the right when the servitude is not being exercised to strengthen for his own protection the gate giving access to the land subjected to the servitude and the fence upon his boundary line, but he must do it in a manner not tending to diminish the use of the servitude or to make it more onerous. He cannot change the condition of the premises.

(6.) The owner of the estate to whom the servitude is due has the right when the owner of the estate owing the servitude has barred entrance to the lands subjected to it to remove the obstructions placed in the way of the exercise of his rights without having recourse therefor to judicial proceedings when he can do so without a breach of the peace. When it has been established on the trial of a particular case that he could validly have exercised such right he cannot be subjected to damages for having applied for and obtained and had executed an ex parte order of court directing the sheriff to remove the obstructions, even though the order should not have been given.

(7.) When the owner of the land to whom a servitude is due finds the exercise of his right prevented by the removal by the owner of the land owing the ser-

vitude of the gate giving entrance to the ground, and the latter refuses on demand to replace matters as they stood, he is warranted in fearing should he open the way to the grounds that entrance thereto would be again barred by the owner unless he should be enjoined from so doing.

ON APPEAL from the Nineteenth Judicial District Court for the Parish of Iberia.  *Voorhies, J.*

*Walter J. Bourke & Bro.* (*Foster & Broussard,* of Counsel) for Plaintiffs and Appellants.

*L. T. Dulany* for Defendant and Appellee.

Submitted on briefs January 12, 1899.
Opinion handed down February 6, 1899.

### STATEMENT OF FACTS.

The opinion of the court was delivered by

NICHOLLS, C. J.   Petitioners prayed the District Court for an injunction directed to the defendant, prohibiting him from further interference with the free use and undisturbed possession of certair described lands, and more particularly that he be restrained fron further obstructing, by fencing and otherwise, any of certain lands which had been donated to them by defendant by notarial act of the 11th of January, 1893, by act before Weeks, notary, for the purpose of facilitating plaintiff's operations in the purchase and transportation of cane to their sugar mill, situated in the parish of Iberia, on which plaintiffs had constructed a tramway and switch.

They averred that since the date of the donation of the lands they had taken possession of the same and had continued to hold them up to date, but that defendant, without right or reason, had fenced off and barricaded the lot of ground described in the act of donation as being of two hundred and fifty feet in length by a width of two hundred and fifty feet used as a dumping ground for cane; that he had placed his fence on said tract and, refusing to move it, was

impeding and obstructing the free passage on said land, and preventing the use thereof for the purpose for which it was donated and used by plaintiffs. That they were about to begin milling operations; that the parties from whom they purchased cane in the neighborhood of said tract required access to the switch on said tract, as in preceding years, had been the rule; that the obstructions to their rights, depriving them of the means and facilities required for their operations, was a nuisance and inflicted upon them irreparable injury. Plaintiffs supplemented their prayer for an injunction by a prayer that the sheriff of Iberia parish be ordered to proceed to the locality indicated, and to remove therefrom the fencing and obstructions set forth, and to clear said lots therefrom.

The District Court, upon this petition, ordered an injunction to issue as prayed for, and instructed the sheriff to proceed at once to the place designated, and to remove therefrom the fencing and obstructions placed thereon by the defendant.

The sheriff, under this order, proceeded to the point specified and made an opening in the fence bordering the public road, thus enabling parties to enter from the public road into the dumping ground. The defendant answered, pleading first the general issue. He admitted the existence of the Act of donation, but denied all rights claimed by plaintiffs under the same.

He averred that plaintiffs' action in suing out the writ of injunction and causing the sheriff to cut down and remove a part of his fence, which enclosed his cultivated lands, was illegal, malicious, and without cause or shadow of right, and that if plaintiff had any right to an entrance upon the land (which he denied) said right could only exist by virtue of the act of January 1, and that said act contained no stipulation requiring defendant to remove any part, or portion, of his fence and enclosure, but imposed on plaintiff the obligation of putting up and keeping all necessary gates.

That the fence enclosing the land referred to as a dumping ground is the fence that enclosed the lands of defendant wherein he cultivated his crops, and by cutting an opening in said fence and leaving the same open, the entire crop of defendant was exposed to the ravages of cattle and other animals. That the wrongful injunction and acts perpetrated thereby had caused him to suffer much annoyance, loss of time, and expenditure of money, and forced him to employ counsel to dissolve the injunction. That he had been damaged by said wrongful

acts in the sum of two thousand dollars. Further answering he alleged that plaintiff had violated the conditions assumed by him in the act of donation, and had forfeited all rights under said act to any portion of the land over which the right of way was granted, and had also trespassed upon the land of defendant, not donated, by laying the tramway or switches in a place different from that designated in the act, and this plaintiff did knowingly, and against the will of defendant, who protested at the time and had repeatedly protested, and demanded that the switch be removed, and which wrongful action resulted in cutting up the land of defendant in a very damaging manner.

He averred that a portion of the land occupied by the switch built by plaintiff was never donated, and that plaintiffs were trespassing thereon; that plaintiffs had forfeited the right of way granted for the reason that the consideration promised, and for which the right of way was granted, had been refused and denied defendant, and in lieu thereof abuse and injury to his property had been perpetrated by the wilful and malicious acts of the plaintiffs. That plaintiffs' refusal to allow him and his laborers the use of the cars and switch had caused him to lose hundreds of tons of cane worth seven hundred and fifty dollars, which he also pleaded in reconvention. That the right, if granted, should be declared forfeited, and plaintiffs decreed the trespassers. That the injunction sued out should be dissolved, with damages, actual and exemplary, in the sum of one thousand dollars each, and attorney's fees in the sum of two hundred and fifty dollars, which he pleaded in reconvention.

He prayed that the injunction be dissolved, with damages, actual and exemplary, in the sum of one thousand dollars for each cause, and with two hundred and fifty dollars attorney's fees, and seven hundred and fifty dollars for cane crops lost.

He prayed that the act of donation of the right of way over his land be declared forfeited and set aside and annulled, or in the alternative if said donation be maintained; that plaintiffs be decreed trespassers on such portions of defendant's lands as were shown to be occupied by the switch, and not designated in the act, reserving defendant's right to enforce a specific compliance with all the stipulations of the act, and to sue for damages resulting from any violation.

The District Court ruled that the setting aside of the act of donation could be demanded only in a direct action; that it could not be

asked in reconvention. It dissolved the injunction with costs. It rejected the demand for damages, declaring that none had been proved. Plaintiffs appealed.

Defendant answered the appeal praying that the judgment be amended by awarding him one hundred dollars for attorney's fees and five hundred dollars as damages, and that as so amended the judgment be affirmed.

## OPINION.

Defendant and appellee having answered the appeal taken herein by plaintiff, asking that the judgment below be affirmed except to the extent which he prayed to have the same amended by awarding him one hundred dollars for attorney's fees and five hundred dollars as damages, our inquiries are limited to ascertaining whether or not the judgment below was correct in setting aside plaintiff's injunction, and if it was, whether or not defendant should not have been allowed his attorney's fees and damages to the extent now claimed.

The evidence established that the plaintiffs were planters engaged not only in the cultivation of cane, and manufacturing of the same into sugar, but in manufacturing sugar from cane purchased by them from their neighbors. That this latter branch of their business necessitated their having under their ownership and control a tramway over the lands of the parties from whom they purchased, and so situated as to enable other parties from when they purchased to avail themselves of the same. That they applied to their neighbors (among whom defendant was one) for assistance, in carrying out this object and succeeded in obtaining from them grants under which they constructed the tramway. The dealings between plaintiffs and defendant touching this matter are shown by a notarial act of the 11th of January, 1893, before Weeks, notary, in which after reciting that plaintiffs were a partnership formed for the purpose of buying cane and refining sugars, etc., and were then locating and about commencing the construction of a switch from their sugar mill in the first ward of the parish of Iberia, near the town of Patoutville, to and including the lands of John B. Lewis, which switch was to pass through the property therein described, Lewis is made to declare that in consideration of the increased value which would be given to said land and of the additional benefits and conveniences resulting from the building of said switch, he gave, granted, donated and conveyed, free from all dam-

age and cost unto Mrs. M. A. Patout, their heirs and assigns, a strip of land in said parish to-wit:

"Said strip of land to be twenty-five feet wide on its whole extent, except as hereinafter given more width for the purposes of curves, yards, etc., beginning and to commence at the western boundary of Frere Bonin's, about where the railroad of the Caffery refinery crosses, and running due north along said last boundary to the public road where said switch, after crossing Frere Bonin's land meets said Lewis' land, said Lewis grants as much land as shall be necessary to make the proper curve, thence due west along south side of the public road, and contiguous thereto, to the extreme northwest corner as shall be necessary to make an extra switch, said switch running along the west line from the northwest corner about two hundred and forty feet, and at the terminus of said extra switch said Lewis grants a tract of land 250 feet in length and two hundred and fifty feet in width, said land to be high land and to be used for the purpose of a yard for dumping cane, switch purposes, etc. Said right of way or strip of land shall be twenty-five feet in width and ———— feet more or less in length.

"To have and to hold the said tract of land for the purposes above mentioned, unto the said Mrs. M. A. Patout & Son, their heirs and assigns forever.

"The said firm of Mrs. M. A. Patout & Son, on their side, bound and obligated themselves to put in all necessary and proper drains, crossings and gates on the line of said switch, if a switch shall be needed, said Lewis, grantor, reserving the right to demand that said switch shall be placed on the northeast corner of his land. Should the said road cease to be used for the purposes stipulated then and in that event said land granted should revert and become the property of grantor."

The evidence showed that the tramway was constructed as it still exists in the year 1894, and that it was utilized in taking off the crops of 1894 and 1895.

As laid, it crosses Lewis' land, on its eastern boundary, running by a northwesterly curve near to the northern boundary of the lands contiguous to which is a public road running east and west. The tramway runs along the northern boundary nearly due west parallel to the public road until it nearly reaches the western boundary of the land where it curves towards and crosses the public road mentioned and leaves Lewis' property. From the point where this last

curve commences, the plaintiff constructed the switch referred to in the act. It runs on a curved line from the main tramway in a south-westerly direction, terminates about sixty feet from the western boundary of Lewis' land, along which there is a second public road at right angles to and connecting with that first mentioned.

At the time of the passage of the notarial act the particular tract of land on which the tramway and switch was built was used by Lewis as a pasture, but it was subsequently turned into a cultivated field. A gate opened from the public road on the northern boundary into this pasture through which outside parties from whom plaintiffs purchased cane passed with their loaded carts, dumping the cane around the end of the switch, to be there loaded into cars. It was soon found that the cattle on Lewis' pasture went upon the dumping ground and to some extent injured the cane lying upon the same.

To remedy this, permission was granted by Lewis to throw a wire fence around the interior lines of the dumping ground. In the meantime, the passing of the loaded cane carts through the pasture having considerably cut it up, Lewis gave permission to the farmers selling cane to the plaintiffs to open a gate opposite to the dumping ground through the fence lying along the public road on the northern boundary, they to be responsible for it. It was through this gate that the farmers mentioned had access to the dumping ground in 1894 and 1895. The interior wire fence to which reference has been made served the double purpose of protecting the farmers' cane from injury from cattle, and also of preventing animals who might accidentally get into the dumping ground through the gate, from passing into the pasture or field beyond. At some time, not fixed with certainty, this interior fence was removed by the defendant. In 1895, just after the grinding season of 1894 had closed, defendant caused the gate opposite the dumping ground to be taken out and placed on the other side of the public road, and the gap in the fence made by such removal to be closed by wires stretched across the same. Defendant on the stand gave as his reason for so doing that the gate had become dilapidated and no longer served as a protection against the ingress and egress of cattle. Just before the commencement of the grinding season of 1896, plaintiffs sent two persons to ask defendant to replace the gate. On his failing to do so, plaintiffs instituted the present proceedings. The testimony in the case and defendant's pleadings show that a disagreement of some kind had taken place between the plain-

Patout vs. Lewis.

tiffs and the defendant, either in respect to the purchase of the cane cultivated by defendant's tenants, or to their right to avail themselves of the cars upon the tramway to transport their cane to other places. The facts of the case are not shown, but defendant in his answer, sets up a claim in reconvention of seven hundred and fifty dollars for damages for loss of cane, and in his testimony referring to the demand on him to re-open or replace the gate, stated that he answered the parties sent to him for that purpose that he "would not put in the gate;" that he thought Mr. Patout had treated him very badly. Defendant denied that he was asked to "re-open the fence;" and insisted that the demand upon him was "to put in the gate." One of the two parties who made the demand upon him, testified to the same effect, but the other testified that he had called upon defendant "to open the gate."

We understand the District Court to have reached the conclusion in view of all the circumstances and probabilities of the case, the relation of parties and the business in which they were respectively engaged; the situation of the properties and the benefits to be derived by each that the notarial act before Weeks, notary, evidenced not a transfer of the ownership of the property described therein, but the creation of a servitude; that therefore, the fence surrounding Lewis' land remained his property and he had the legal right to take out the gate which the farmers had placed in the fence, and close the gap; particularly at a time when the servitude was not being exercised. That there was nothing in the act of January, 1893, entitling the plaintiffs to deprive defendant absolutely of the exercise of that right; that the evidence left the exact legal location of the dumping ground in doubt, and it was a question whether, under the act, it was not entirely inside of the pasture away from the fence and the northern boundary line of Lewis' land. The court in its reasons for judgment, said:

"The fence formed no part of the property donated; it was and still is his property, of which he may dispose as he judges proper, provided he does so in a legal manner, although others might be inconvenienced by his action. He could certainly close his gate, which is a part of the enclosure of his lands and prevent ingress and egress through it, unless it be shown that by some act of his he has divested himself of the power to do so. The act of donation is mute on the subject; there is no proof other than that he allowed the use of that gate by suffer-

ance and to accommodate his neighbors. He therefore cannot be hampered in the use he may desire to make of his property. The court is of the opinion that the plaintiffs have no real right that they can exercise on the gap or gate in question. They have no right of way through the gate without the consent or permission of the defendant. The court was of the opinion that under no circumstances were the plaintiffs authorized to deal with the fence in manner such as to leave defendant's field unprotected.

Defendant's counsel says: "It will be noted that one of the conditions of the act on which plaintiff bases his right was that the plaintiff should keep up all necessary gates, hence it was his duty to keep up this gate opening into the dumping ground, but while he looks upon it as such a necessity as to warrant him in calling upon the court, he did not take care to see that it was kept in standing order. Plaintiff's laches in this matter made it necessary that defendant should act to protect himself, and finding the gate broken and down he closed the gate with wire. The dumping ground was not in use at that time of the year and the closing did not and could not injure any one or in any manner interfere with the rights of plaintiff. Neither was it a trespass on the land of plaintiff since he had no ownership in the land, but the use of it only at a certain season of the year."

"The failure of the defendant to obey plaintiffs' order to him ill suited their imperious temper, and without hesitation they invoked the machinery of the court to enforce their mandate.

"The Deputy Sheriff who executed the writ and Mr. Davis, both witnesses for the plaintiffs, say that it only required ten minutes work with a hatchet to remove the wires obstructing the gate. Mr. Davis says there was no physical or other opposition made to the opening of the gate, and Mr. Lewis swears that he never made or threatened to make any objection."

"Then, if no objection was made by defendant or any other person, why did not the plaintiff open the gate himself, instead of suing out an injunction and having the sheriff to open it, and that sometime before it was necessary for use and while he was obligated to keep up all necessary gates."

"The evidence showed that no threat was made by Mr. Lewis, and no reason at all can be given by the plaintiff for apprehending opposition to opening the gate, or that it would be again obstructed by defendant."

The first point to which we direct our attention is the contention made by the defendant that the dumping ground was improperly located and that plaintiffs had no rights whatever at the particular spot where defendant barricaded the fence. For the purposes of this suit we must assume the location was the proper one. A fixed *status* or condition of things reaching over a number of years, the consent to which is evidenced not only by the silence and acquiescence of defendant, but by affirmative acts on his part, cannot be ignored and collaterally drawn in question as has been attempted to be done by defendant.

The switch was constructed years ago, and the dumping ground has been occupied where it now exists ever since, not only under the eyes of Mr. Lewis without complaint, but by his express permission the farmers of the neighborhood were permitted to have access at first through the pasture gate, and subsequently through the gate opposite the end of the switch. It was the duty of the defendant under Article 779 of the Civil Code, if the manner in which the servitude was to be used was uncertain, and if the place necessary for the exercise of the right of passage was not designated in the title to fix the place where he wished it to be exercised. We think he has done so in this case.

Defendant insists that there was no mention in the act before Weeks of any grant to plaintiffs or others to enter upon the dumping ground through his northern boundary fence; that even if it had been located along that line the act cannot be extended beyond its exact terms as to the character and extent of the rights granted; that in point of fact the dumping ground was intended to have been located entirely within and away from the fence, and he was not called upon to grant a right of way from it to the public road. That the act contained not a word of restriction upon his right or ownership in respect to the fence.

There was no necessity for the plaintiffs to have expressly granted to the defendant and the parties from whom he purchases cane, a right of ingress to, and egress from the dumping ground to the public road through the fence, nor a right of way to and from the same over intermediate land of the defendant, if such there was. Defendant was fully advised as to the object intended to be accomplished by the switch and dumping ground, and in consenting thereto, necessarily consented to everything necessary to be done to make the grant effective in the manner contemplated by the parties.

The principle announced in Article 2490 of the Civil Code, which casts upon a vendor "the obligation of delivering the thing sold in-

cluding the accessories and dependencies without which it would be of no value or service, and likewise everything that has been designed to its perpetual use" has application in this matter.

The same principle finds expression in Articles 701, 702, 1903, 1930, 1954 and 1964 of the Civil Code.

There was no necessity for the act to have contained any express declaration by defendant that he did through the agreement to which he was then consenting, impose any restrictions upon his rights of ownership in respect to the fence. The acquisition of rights by the plaintiffs carried with it, *ipso facto,* as a consequence, all restrictions upon defendant's rights which would be necessary to give effect to the rights conveyed.

Article 772 of the Civil Code, declares that he to whom a servitude is due has a right to make all the works necessary to use and preserve the same, and Article 774 gives to the owner of the estate to which a conventional servitude is due, the right to go on the estate, which owes the servitude, with his workmen, in the place where it is necessary to construct or repair the works for the exercise of the same.

Plaintiffs were entitled to place a gate in the boundary fence, in order to give to those from whom he purchased cane, ingress and egress from the dumping ground. He was also authorized to enclose the dumping ground on the interior of the pasture by a wire fence, to protect the cane thereon from being injured by cattle. This fence was not only necessary for the use of the servitude granted, but it was beneficial to defendant, in barring the entrance of cattle from without upon defendant's pasture. (C. C. 662).

It may be conceded that the granting of the servitude to plaintiffs did not withdraw from the defendant the right of repairing the gate and taking steps to protect his field or pasture from outside depradations by temporarily extending wires across the place occupied by the gate during the period when the servitude was not being exercised, but this is something other than a right to take down and remove the gate and to bar future entrance to the dumping ground, for Article 777 of the Civil Code declares that "the owner of the estate which owes the servitude, can do nothing tending to diminish its use or to make it more inconvenient, thus he cannot change the condition of the premises."

Defendant intimates that it was not his intention to do more than to temporarily protect himself; that he nowhere declared that plaintiff

Patout vs. Lewis.

and his vendors of cane should not thereafter have access to the dumping ground; that it only required a hatchet and a few minutes work to have replaced matters in their original situation; that plaintiff or his workmen could have done this themselves, and plaintiff acted maliciously in having recourse to judicial assistance.

We are of the opinion that the plaintiffs had the right to replace matters themselves, if they could have done so, without the danger of a breach of the peace, but we do not see that they incurred any increased responsibility, or lost any of their rights by asking and obtaining the aid of the court in enforcing this right. We are not called upon to say whether the court could not have legally declined such assistance, or whether such aid having been ordered to be given, defendant could not, before it was executed, have stayed the order.

The order has been given and executed, and the replacing of matters in their original *status* has become an accomplished fact. We do not see how, as matters stand, defendant was prejudiced by the fact complained of.

We are not prepared, under the circumstances of this case, to regard defendant's action in taking down and removing the gate and stretching wires across the gap, as having been intended to be merely temporary, and done with the object of temporary protection to his field. We are of the opinion, on the contrary, that defendant intended to permanently close the fence and bar future entrance to the dumping ground, and that plaintiff had reason to believe that the obstruction to such entrance, placed there by defendant, and then existing, was intended to be permanent; that the removal of same, if attempted, might be resisted, and if removed, that it would be replaced.

We are of the opinion that plaintiff was justified in seeking a restraining injunction. We do not understand its effect will be to prohibit defendant from exercising hereafter any rights which he may legally have, touching the fence in question, but simply in preventing him from doing anything tending illegally to diminish the use of the servitude or to make it more inconvenient—from changing the condition of the premises to the prejudice of plaintiff's rights. With that construction given as to the scope, extent and effect of the injunction which issued herein, we are of the opinion that the judgment of the District Court was erroneous and it should be set aside.

For the reasons assigned, it is ordered, adjudged and decreed that the judgment appealed from be and the same is hereby annulled.

avoided and reversed, and the injunction is re-instated and the cause remanded to the District Court, costs of appeal and of the District Court to be borne by the defendant and appellee.