KNOLL, Judge.
Dr. Garland D. Miller appeals an adverse judgment dismissing his claim against Long Oil & Gas Exploration, Ltd. (hereafter Long) for damages for Long’s failure to comply with the terms of a written contract which granted Long a servitude of passage to and from an oil well in Sabine Parish.
The trial court ruled that: (1) even though the servitude did not specify the location of the road, the parties agreed on its location; (2) since Miller failed to prove the parish requirements for the construction or maintenance of a rural, non-subdivision road, he is not entitled to damages because he failed to show a breach of the contract; and (3) it is more believable than not that subsequent to the confection of the written contract, Miller and Long verbally agreed to a location for the placement of the pipeline different from that stipulated in the servitude.
Miller contends that the trial court was manifestly erroneous in: (1) its interpretation of the contract; (2) its determination that Miller failéd to carry his burden of proof regarding the location and construction requirements of the road; and (3) its conclusion that Miller and Long verbally amended the written contract to provide for another pipeline location. We affirm.
FACTS
On March 1, 1985, Miller purchased approximately 37 acres in rural Sabine Parish which border Toledo Bend. At the time of this purchase, the property was already burdened by an oil, gas, and mineral reservation) and a mineral lease existed in favor of Long. However, the mineral lease did not have an ingress and egress clause, and no drilling activity existed on the property either prior to or at the time of Miller’s purchase.
*77 On April 15, 1985, Long, represented by its president, Palmer R. Long, entered into a written contract with Miller in which Miller granted Long the rights of ingress and egress to two well sites for the drilling and production of minerals. In consideration for this right Long gave Miller a ½6 working ownership interest in the wells, together with other stipulations not pertinent to this litigation, and particularly contracted as follows:
“(2) The drilling of wells on the property causes the need for there to be a good road on the property for heavy oil trucks and production trucks. Long Oil will build this road. There will be an agreed upon entry for such to be done and where. Said road shall be built and maintained to parish size and specifications.
* * * * * *
(8) It is agreed and understood that at no time will any compressor units be used on the premises. Further that the tank batteries shall be located on adjacent property commonly referred to as the Martinez tract. The pipeline shall run south from the well site to a fence line, then from the fence line to the Martinez tract in as near a straight line as possible.”
Approximately 37 days after signing this agreement, Long drilled a well on the subject property. Although the well was initially productive, its performance diminished. Its productivity at the time of trial was not established.
Almost one year later, on March 14, 1986, Miller advised Long by letter that their contract was in default for five specific reasons, two of which were failure to build a road to the wells which met parish specifications, and failure to lay the pipeline in the location designated by the contract. On or about May Í4, 1986, Miller and Long’s well operator met with attorneys for Miller and Long to amicably address these questions, and as a result of this discussion Miller hired a surveyor to mark a specific road site on the property. Although the record shows that Miller presented a copy of the survey to Long’s attorney, the road depicted on Miller’s survey was not acceptable to Long and was never built. Miller then filed this action against Long on August 29, 1986.
ROAD LOCATION AND DESIGN SPECIFICATIONS
Miller contends that he intended to subdivide his rural acreage. He argues that the trial court erred in its determination that the parties to the servitude agreement did not envision a road built to subdivision specifications, and in further finding that Miller failed to prove the requirements of a rural, non-subdivision road by a preponderance of the evidence. Miller further argues that the trial court was erroneous when it determined that he verbally agreed to locate the road over an existing logging road through the property.
We will first address the location of the road.
LSA-C.C. Art. 750 provides that, “If the title does not specify the location of the servitude, the owner of the servient estate shall designate the location.”
Unlike the location of the pipeline, discussed more fully infra, which was specified, the servitude of passage for the road simply provided that, “There will be an agreed upon entry for such to be done and where.” For the reasons which follow, we find no error in the trial court’s determination that Miller and Long agreed that the road would be located along an existing logging road.
In Patout v. Lewis, 51 La.Ann. 210, 25 So. 134 (1899), the Supreme Court determined that a dumping ground, not specifically designated in a predial servitude, was improperly located. In Patout, the court applying Art. 779 (1870), now LSA-C.C. Art. 750, stated, 25 So. at page 138:
“[W]e must assume the location was the proper one. A fixed status or condition of things, reaching over a number of years, the consent to which is evidenced not only by the silence and acquiescence of defendant, but by affirmative acts on his part, cannot be ignored and collateral *78 ly drawn in question as has been attempted to be done by defendant.”
Although the facts of the case sub judice are not as forcefully present as they were in Patout, we nonetheless find the Patout rationale applicable. Palmer Long testified that he and Miller discussed the issue of the road placement prior to the signing of the servitude, and that they agreed that it was most expeditious if they followed the logging road to the well site. Miller disagrees. It is axiomatic that credibility determinations and the resolution of factual differences are within the purview of the trier of fact. In the present case, the record establishes that Miller lives on the property in question and he was at the well site almost daily during development of the well. It also shows that Miller, as a working interest owner of minerals, had a vested interest in the speedy completion of the well. The record further shows that it was not until almost a year later that Miller formally objected to Long about various contractual breaches that occurred, failing even at that time to make any mention that the road was not properly located along a route designated by him. Moreover, it was not until June of 1986, more than a year after the servitude was signed, that a surveyor staked out a proposed road at Miller’s behest.
After carefully reviewing the record in light of the principles outlined in Patout, we cannot say that the trial court was manifestly erroneous in its determination that Long’s placement of the road was not at a location designated by Miller.
We now turn to Miller’s argument that Long failed to construct a road and maintain it to parish size and specifications as outlined in the servitude of passage.
Under the terms of LSA-C.C. Art. 697, the title which created the servitude of passage also regulates the use and extent of the servitude. Furthermore, LSA-C.C. Art. 730 directs that when there is doubt about the extent or manner of exercise of a predial servitude that such doubt shall be resolved in favor of the servient estate.
Miller’s problem from the outset is that he introduced no evidence at trial which established Sabine Parish’s specifications for the construction and maintenance of roads which‘are not in a subdivision. In order for Miller to recover damages for breach of the contract, he must establish by a preponderance of the evidence that a breach occurred. Accordingly, for him to prevail on this issue, he must successfully argue that the trial court erred in its determination of the parties’ intent when they signed the written servitude agreement.
Though the servitude agreement is inartfully drafted in several respects, we, nonetheless, find no ambiguity in the references within the servitude agreement to the type of road that was intended. Paragraph two of the agreement states that the purpose of the contract was to grant access to Long across Miller’s property so that minerals could be drilled from two well sites. In this regard it is important that Miller readily admits that the road referred to in the agreement was to stop at the oil wells, and not continue through the rest of his property. Furthermore, paragraph 5(2) states that there is a need for Long to build a good road on Miller's property so that heavy oil trucks and production trucks could service the oil wells. Clearly, then, from the four comers of the servitude instrument, the trial court correctly determined that the parties intended to construct a road which would service the wells, and did not envision a road built to subdivision requirements.
In light of the unambiguous language of the instrument which created the servitude, we find that it is immaterial that Miller may have purchased the property for resale and development. The evidence bears out that there were negotiations prior to the confection of this agreement to include testimony from Miller that his attorney reviewed the preliminary draft and made revisions which were incorporated in the final agreement. Accordingly, if Miller had intended that the road Long was obligated to construct was supposed to be to subdivision regulations, Miller had every opportunity to so specify. Likewise, Miller’s reliance on a statement by Palmer Long at trial that he reviewed a subdivision plat prior to *79 signing the servitude is over emphasized. At no time during trial did Miller introduce into evidence, or even refer to, a plat depicting the subdivision of his property, especially one which may have existed prior to the signing of the servitude. After carefully examining the record, we find the only plat referred to during trial was one which was drafted more than a year after the agreement was signed. Thus, Palmer Long’s statement cannot be read in isolation, and its impact must accordingly be diminished when viewed in light of the totality of the evidence adduced.
The three resolutions of the Sabine Parish Police Jury, one of which Miller stipulated at trial was not applicable herein because it was accepted after the confection of the contract at issue, adopt the standards for road construction and maintenance established by the Department of Transportation in all respects except subdivision roads for which the police jury specifically provides minimum standards. At no time did Miller introduce evidence to establish the parish standards for a rural, non-subdivision road. Therefore, based on the foregoing, we find no error in the trial court’s determination that Miller failed to prove by a preponderance of the evidence that Long breached the contract by failing to construct a road to parish specifications.
In conclusion, although we agree with Miller that the photographs show an un-graveled road with erosion problems, we cannot say that the trial court erred in not awarding damages since, as the trial court found, there were no parish standards in the record against which we can compare these conditions. See Saulter v. Cousin, 294 So.2d 251 (La.App. 1st Cir.1974). Simply stated, we find Miller failed to prove a breach.
PIPELINE LOCATION
Miller next contends that the trial court erred in finding that Long and Miller verbally agreed to modify a provision of the servitude agreement which specifically designated the location of the pipeline. Long argues that the trial court was not manifestly erroneous in its conclusion that Miller and Long verbally agreed to this change. Long further contends that this verbal agreement to relocate the pipeline was sufficient because this was a construction contract, and as such was not required to be in writing. We will first address the trial court’s determination that a verbal agreement was reached, and then we will discuss the question of whether a written servitude agreement may be verbally modified by its signatories.
Although paragraph 8 of the servitude agreement specifically provides that, “The pipeline shall run south from the well site to a fence line, then from the fence line to the Martinez tract in as near a straight line as possible.”, the trial court found that instead Miller verbally agreed to locate the pipeline along the existing logging road. We find no manifest error in the trial court’s determination. Palmer Long testified that the relocation of the pipeline expedited completion of the well, and asserted that Miller, who had no interest in the lease payments, was in favor of such a change because it would mean that as a working interest owner he would be paid with less delay. Moreover, Miller, as more fully detailed hereinafter, did not deny that he made a verbal agreement with Long to relocate the pipeline.
Nevertheless, we disagree with Long’s characterization of this agreement as a contract to construct a pipeline. In the agreement, Miller was not consenting to the construction per se of the pipeline, but rather the routing of the constructed pipeline in the particular location designated in the servitude. Accordingly, we find that the agreement between Miller and Long established two predial servitudes: one, for ingress and egress along the road, and the other, for the routing of the pipeline through Miller’s property. Thus, we are squarely presented with a question of whether the original parties to a predial servitude may subsequently amend their agreement verbally.
Servitudes may be established by title under any juridical act sufficient to transfer immovables. LSA-C.C. Arts. 708, *80 722. The establishment of predial servi-tudes by juridical act is subject to the formal and substantive requirements governing the transfer of immovable property. Guillotte v. Wells, 485 So.2d 187 (La.App. 2nd Cir.1986), quoting Comment (b) to LSA-C.C. Art. 722. Delivery of the act of transfer or use of the right by the owner of the dominant estate constitutes tradition. LSA-C.C. Art. 722. Accordingly, we must first look to the codal provisions applicable to the transfer of immovable property to determine whether Miller and Long could verbally amend their written servitude agreement.
LSA-C.C. Art. 1839, which restated former LSA-C.C. Art. 2275, provides:
“A transfer of immovable property must be made by authentic act or by act under private signature. Nevertheless, an oral transfer is valid between the parties when the property had been actually delivered and the transferor, recognizes the transfer when interrogated on oath. ” (Emphasis added.)
Although LSA-C.C. Art. 1839 states the general rule regarding the need for a written instrument, it also establishes a narrow exception to the writing requirements for onerous and gratuitous transfers of immovable property. In an effort to balance LSA-C.C. Art. 1839’s exception to the writing requirement, the jurisprudence holds that in cases where an alleged vendee under a verbal sale of immovable property propounds interrogatories to his vendor who answers and denies the sale, such denial is conclusive and final and may not be traversed or contradicted. Edmiston v. Barnes, 395 So.2d 924 (La.App. 2nd Cir.1981).
In Guillotte, supra at page 190, the appellate court held that the limited exception stated in LSA-C.C. Art. 1839 is applicable to predial servitudes so that the grantor’s judicial admission that he gave verbal permission to the grantee to construct and use a pipeline amounts to an oral confession. See also Yiannopoulos, 4 Louisiana Civil Law Treatise, Predial Servitudes, Sec. 124, p. 355 (1983). But see Robert Inv. Co., Inc. v. Eastbank, Inc., 496 So,2d 465 (La.App. 1st Cir.1986), and Stinson v. Lapara, 62 So.2d 291 (La.App.Orl.Cir.1953). Accordingly, since under the narrow exception of LSA-C.C. Art. 1839, it is permissible between the parties for predial servitudes to be established verbally, it follows that, as between those parties, a written servitude may also be orally amended. In the present case we must review Miller’s testimony to see if he denied making the verbal amendment.
The record shows the only testimony by Miller concerning the verbal amendment was during cross-examination, as reflected in the following colloquy:
“Q. How did the line then ever come to be laid along the road? Did you ever give your consent to the laying of that line along the road?
A. I don’t recall. I don’t think so.
Q. So, if Palmer Long takes the stand and testifies that you and he made an agreement to lay that line in its existing location [along the logging road], Palmer Long is going to be telling an untruth? A. Like I said, I don’t recall ever agreeing for that line to come out to the northwest.
* * * * * *
Q. So it’s your sworn testimony that you never had a discussion with Palmer Long before that pipeline was laid as to its location along the road rather than as stated in the contract?
A. No, sir, I said I don’t recall.
Q. So, you might have, but you just don’t recall?
A. Absolutely, that’s my testimony.”
Applying the rules discussed hereinabove to the predial servitude at issue, as was done in Edmiston, Miller’s testimony under oath does not show a clear denial of Palmer Long’s sworn assertion that Miller agreed to allow Long to relocate the pipeline at a location other than that designated in the servitude. Accordingly, we find that the jurisprudential limitation of LSA-C.C. Art. 1839 is inapplicable to the facts presented here.
Therefore, having already found that the trial court was not manifestly erroneous in *81 its conclusion that Miller verbally amended paragraph 8 of the servitude dated April 15, 1985, in accordance with LSA-C.C. Art. 1839 and its interpretative jurisprudence, we find that Miller and Long are bound by their verbal amendment of the agreement.
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Miller.
AFFIRMED.